Blair v. Mehta

C.P. of Lycoming County, no. 03-00954.

*Clifford A. Rieders* and *C. Scott Waters,* for plaintiffs.
*Alan S. Baum,* for defendants Simms, Datta, New Jersey/Pennsylvania EM-1 Medical Services and West Branch Emergency Physicians.
*Mark T. Perry,* for defendants Mehta and Women's Health Care Associates.
*David R. Bahl* and *Brian J. Bluth,* for defendants Susquehanna Physician Services, The Williamsport Hospital and Susquehanna Health System.

KIESER, *J.,* June 10, 2004—Before the court for determination are the preliminary objections of defendants Pankaj G. Mehta M.D. and Women's Health Care Associates P.C. filed November 7, 2003. The defendants raise four preliminary objections. The court will deny in part and grant in part the preliminary objections.

The preliminary objections presently before the court were filed in response to the amended complaint filed on October 21, 2003. The amended complaint alleges the following facts. On June 16, 2001, Brenda Blair, the deceased, first began experiencing vomiting and diarrhea. Three days later on the 19th, Brenda experienced vomiting and abdominal pain. Around 9 that night, Joyce Blair, Brenda's mother, took Brenda to the Williamsport Hospital's emergency room. At 11:45 p.m., Dr. Simms examined Brenda and ordered blood studies. He diagnosed her with acute abdominal pain. He discharged Brenda at 1:40 a.m. after proscribing her Levsinex and advising her to increase her fluids and follow up with her family physician.

At 6 a.m. on June 20, 2001, the Williamsport Hospital called Brenda and informed her that she had an elevated white blood count. At 8:15 a.m. that day, Brenda went back to the emergency room because her abdominal pain had worsened. She complained of increasing lower abdominal pain, vomiting and diarrhea. Dr. Datta examined Brenda. The examination revealed that Brenda's abdomen was tender and no bowel sounds were present. Dr. Datta ordered an IV, labs, an abdominal and pelvic CT scan, and intravenous IV Toradol and Droperidol. The lab work indicated an elevated white blood count, elevated segs, and decreased lymphs. The pelvic CT scan showed posterior pelvic fluid and inflammatory changes. Dr. Datta consulted Dr. Mehta. Dr. Mehta requested that Brenda be brought to her office at the hospital.

Dr. Mehta's examination of Brenda found that Brenda had a significant amount of abdominal pain and generalized tenderness. Brenda also complained of continued

nausea. Dr. Mehta's impression was moderate to severe abdominal and pelvic pain with unknown etiology. Dr. Mehta decided to perform a laparoscopy on Brenda. At 1:36 p.m. on June 20, 2001, Brenda was admitted to the Williamsport Hospital. At 6:35 p.m., Dr. Mehta performed the laparascopy. The pelvic organs including tubes, ovaries, and uterus were found to be normal. There was a lot of small bowel distension caused by gas making it impossible to view the appendix.

Following the laparascopy, Brenda received pain medication at 9 and 11 p.m. Early in the morning of the 21st, Brenda was given additional pain medication and had lab work done. The lab work indicated that her white blood count was elevated, but not as high as before, and decreased segs. Brenda received pain medication at 9:30 a.m. and again at 2:30 p.m. Dr. Mehta ordered additional blood work at 4 p.m. It showed a slight decrease in white blood count, but it was still elevated. Dr. Mehta concluded that Brenda should be discharged. Dr. Mehta wrote prescriptions for antibiotics and pain medication. Brenda was discharged shortly thereafter, despite being in significant pain.

Brenda's pain continued while she was at home. She remained in bed and could not eat. On June 24, 2001, Brenda called the Williamsport Hospital emergency room to see if anything could be done for the gas pain she was experiencing. She was advised to take Gas X. Brenda took the Gas X, but it did not relieve her pain.

On June 25, 2001, Brenda called Dr. Mehta's office complaining of a lot of gas and significant abdominal pain. Brenda was instructed to take a dose of a laxative that day and use as needed the next day. Joyce Blair pur-

chased the laxative for Brenda and Brenda took some of it. After ingesting the laxative, Brenda experienced severe pain and her condition worsened to the point of delirium.

On June 27, 2001, an ambulance transported Brenda to the Williamsport Hospital emergency room. She arrived at 5:20 a.m. An emergency room physician examined Brenda. She had an elevated pulse and respiratory rate. Brenda's abdomen was distended and tender. Brenda was pale, cool and clammy with mottling of her arms and legs. Her blood pressure had dropped, and she had an elevated white blood count. A CT scan of the abdomen showed a significantly distended stomach with air in the small bowel. The stool was positive for blood.

Brenda was admitted to the intensive care unit at 11:24 a.m. At 3:20 p.m. she underwent abdominal exploratory surgery. The surgical exploration revealed total necrosis of the small bowel with additional ischemic damage to the right colon and transverse colon. The surgeon stopped midway through the surgery to discuss Brenda's condition with her family. Brenda's abdomen was closed and she was returned to the critical care unit at 4:45 p.m.

On June 28, 2001, at 2 a.m., nursing personnel contacted Brenda's family because her condition had deteriorated. Brenda died at the Williamsport Hospital on June 28, 2001, at 2:33 a.m. On June 29, 2001, an autopsy was performed that concluded the cause of death was complications of fulminant inflammatory bowel disease including mesenteric thrombophlebitis with bowel infarction.

At the time of her death, Brenda Blair was 36 years old. She was survived by her parents, Joyce A. and Joseph Blair and a sister, Catherine Winnie.

The first of the four preliminary objections defendants raise is that the allegations of negligence are not sufficiently specific. Defendants contend that the allegations in paragraphs 68.4, 68.6, 68.8 and 69.8 are general, vague and boilerplate allegations that would permit the plaintiffs to file new causes of action after the expiration of the statute of limitations.

The second preliminary objection is that the damages sought by the plaintiffs in paragraphs 69.6 and 133 are not compensable under the Wrongful Death Statute, 42 Pa.C.S. §8301. Citing *Skoda v. West Penn Power Company,* 411 Pa. 323, 191 A.2d 822 (1963), defendants assert that damages for services, companionship, society, comfort, guidance, solace, protection, friendship, love, tutelage and affection cannot be recovered under the Wrongful Death Statute. Defendants assert that "wrongful death damages are only awarded to compensate certain enumerated relatives of the deceased for the pecuniary loss occasioned to them through the deprivation of the part of the earnings of the deceased which they would have received from him had he lived." Brief in support of preliminary objections of defendants Pankaj G. Mehta M.D. and Women's Health Care Associates P.C. to plaintiffs' amended complaint, *Blair v. Mehta,* no. 03-00,954 at 4 (Lycoming Cty. 2003).

The third preliminary objection is that plaintiffs have failed to state a claim for negligent infliction of emotional distress against defendants. Defendants contend that plaintiffs have failed to allege that they had knowledge or showed knowledge of the alleged negligent treatment as it was occurring.

The fourth preliminary objection is that the request for punitive damages against Dr. Mehta in Count XIII of the amended complaint should be stricken. Dr. Mehta argues that the allegations in the amended complaint do not rise to the level of egregiousness that would warrant an award of punitive damages. Rather, at most, the allegations sound of negligence.

In response, plaintiffs argue that the allegations of negligence are sufficiently specific. Plaintiffs argue that the language is not vague and open ended, but, when read in conjunction with the entire amended complaint, is limited and specific. As to the claim for damages under the Wrongful Death Statute, plaintiffs argue that parents, Joyce and Joseph Blair, are entitled to seek compensation for the pecuniary loss they have suffered as a result of Brenda's death. That pecuniary loss includes services the decedent would have performed for the parents. Plaintiffs argue that included within those services is the companionship, society, comfort, guidance, solace and protection that Brenda would have provided her parents. As such, plaintiffs contend they are entitled to seek recovery for those damages.

Addressing the demurrer to the negligent infliction of emotional distress claim, plaintiffs argue that, while a plaintiff must observe the negligent conduct, there is no requirement that the plaintiff understand at the time the event was occurring that there was negligence. Plaintiffs argue that they have pleaded a negligent infliction of emotional distress claim against defendants. Plaintiffs assert that they witnessed the alleged negligent conduct by Dr. Mehta, were suspicious and concerned about the care at the time it was rendered, and witnessed and expe-

rienced the traumatic events of Brenda's health deteriorating and her eventual death.

As to the request for punitive damages against Dr. Mehta, plaintiffs argue that, while more than mere negligent conduct is required, punitive damages may be awarded if it can be shown that the defendant acted with reckless indifference to the rights of others. Reckless indifference may be shown if the defendant knew or had reason to know of facts which created a high risk of physical harm to a plaintiff, and the defendant nevertheless proceeded to act in conscious disregard of, or indifference to, that risk. Plaintiffs argue that the allegations in the amended complaint concerning Dr. Mehta's failure to conduct standard medical tests or follow-up in the face of known symptoms, with knowledge of the risks involved, demonstrate a reckless indifference to the rights of Brenda and warrant an award of punitive damages.

## PRELIMINARY OBJECTION 1
## SPECIFICITY OF THE NEGLIGENCE PLEADINGS

First, the court will address the motion to strike the allegations of negligence. Pennsylvania is a fact-pleading state. *Miketic v. Baron,* 450 Pa. Super. 91, 104, 675 A.2d 324, 330 (1996). A complaint must set forth the material facts upon which the cause of action is based in a concise and summary form. Pa.R.C.P. 1019(a). The complaint must apprise the defendant of the claim being asserted and summarize the material facts needed to support the claim. *Cardenas v. Schober,* 783 A.2d 317, 325 (Pa. Super. 2001); *Alpha Tau Omega Fraternity v. Uni-*

*versity of Pennsylvania,* 318 Pa. Super. 293, 298, 464 A.2d 1349, 1351 (1983).

The amount of detail or level of specificity required is "incapable of precise measurement." *Pike County Hotels Corp. v. Kiefer,* 262 Pa. Super. 126, 134, 396 A.2d 677, 681 (1978). However, the complaint must set forth enough material facts to allow the defendant to prepare a defense to the allegations contained within the complaint. *Weiss v. Equibank,* 313 Pa. Super. 446, 453, 460 A.2d 271, 274 (1983); *PennDOT v. Shipley Humble Oil Co.,* 29 Pa. Commw. 171, 173, 370 A.2d 438, 439 (1977). Based on *Connor v. Allegheny General Hospital,* 501 Pa. 306, 311 n.3, 461 A.2d 600, 602-603 n.3 (1983), and its progeny, the language used in the complaint must also be specific enough as not to allow the plaintiff to assert new causes of action or theories of liability at a later date under the guise of merely amplifying what has been timely pleaded. In examining the complaint, the focus is not upon one particular paragraph in isolation. *Yacoub v. Lehigh Valley Medical Associates P.C.,* 805 A.2d 579, 589 (Pa. Super. 2002). The paragraph at issue must be read in conjunction with the complaint as a whole to determine if there is the requisite level of specificity. *Id.*

The motion to strike the negligence allegations will be denied in part and granted in part. The language at issue is the following:

"68.4 Failing to conduct appropriate diagnostic studies to diagnose Brenda's condition;

"68.6 Failing to conduct additional diagnostic tests after surgery;

"68.8 Failing to appreciate the significance of Brenda's abnormal lab work;

"69.8 Plaintiffs and decedent lost such other valuables and sustained such other damages as are properly allowed by Pennsylvania law." Amended complaint, ¶¶68, 69, *Blair v. Mehta,* no. 03-00,954 (Lycoming Cty. 2003).

Subparagraphs 68.4, 68.6 and 68.8 are sufficiently specific when read with the rest of the amended complaint. The factual allegations define the scope of the allegations made in these subparagraphs. The amended complaint sets forth the facts describing Brenda's medical condition when Dr. Mehta began treating her. The alleged failures in subparagraphs 68.4, 68.6 and 68.8 are limited to what Dr. Mehta should have done when presented with a patient having the same symptoms as Brenda. Medical science and the alleged course of treatment further restrict Dr. Mehta's alleged failures to a finite and ascertainable list to which defendants can prepare a defense. Therefore, the preliminary objection to subparagraphs 68.4, 68.6 and 68.8 is denied.

As to subparagraph 69.8, the preliminary objection will be granted. This paragraph is vague and at best is surplusage. The damages plaintiffs are seeking, and would be entitled to if they prevail on their claims, are set forth in the counts pertaining to the wrongful death action, the survival action, the negligent infliction of emotional distress claim, and the punitive damages claim. Therefore, the preliminary objection shall be granted.

Accordingly, the motion to strike the negligence allegations will be denied in part and granted in part.

## PRELIMINARY OBJECTIONS 2, 3 AND 4

In analyzing the next three preliminary objections, the court shall be guided by the standard used in deciding a demurrer. A preliminary objection, in the nature of a demurrer, should only be granted when it is clear from the facts that the party has failed to state a claim upon which relief can be granted. *Sunbeam Corp. v. Liberty Mutual Insurance Co.,* 566 Pa. 494, 499, 781 A.2d 1189, 1192 (2001). The reviewing court in making such a determination "is confined to the content of the complaint." *In re Adoption of S.P.T.,* 783 A.2d 779, 782 (Pa. Super. 2001). "The court *may not* consider factual matters; no testimony or other evidence outside the complaint may be adduced and the court may not address the merits of matters represented in the complaint." *Id.* (emphasis in original) The court must admit as true all well pleaded material, relevant facts and any inferences fairly deducible from those facts. *Willet v. Pennsylvania Medical Catastrophe Loss Fund,* 549 Pa. 613, 619, 702 A.2d 850, 853 (1997). "If the facts as pleaded state a claim for which relief may be granted under any theory of law then there is sufficient doubt to require the preliminary objection in the nature of a demurrer to be rejected . . . ." *Id.* (quoting *The County of Allegheny v. The Commonwealth of Pennsylvania,* 507 Pa. 360, 372, 490 A.2d 402, 408 (1985)).

## WRONGFUL DEATH DAMAGES

Addressing the demurrer to the request for damages resulting from the loss of the companionship, society, comfort, guidance, solace and protection Brenda would

have provided her parents, the court will deny the demurrer. The Wrongful Death Statute provides:

"(a) *General rule.*—An action may be brought, under procedures prescribed by general rules, to recover damages for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another if no recovery for the same damages claimed in the wrongful death action was obtained by the injured individual during his lifetime and any prior actions for the same injuries are consolidated with the wrongful death claim so as to avoid a duplicate recovery.

"(b) Beneficiaries.— . . . [T]he right of action created by this section shall exist only for the benefit of the spouse, children or parents of the deceased . . . ." 42 Pa.C.S. §8301(a), (b).[1]

The most recent appellate decision brought to the attention of this court on the issue of damages recoverable under a wrongful death action permitted a child to recover for the loss of companionship, comfort, society and guidance the deceased parent would have provided. *Machado v. Kunkel,* 804 A.2d 1238 (Pa. Super. 2002). In so holding, the *Machado* court stated:

"[O]ur courts have recognized that under the Wrongful Death Act, children can recover for losses occasioned by the death of their parent(s).

---

1. In an action brought under 42 Pa.C.S. §8301, the damages are distributable in accordance with the intestacy statute; the plaintiff may also recover "damages for reasonable hospital, nursing, medical, funeral expenses, and expenses of administration necessitated by reason of injuries causing death." 42 Pa.C.S. §8301(b), (c).

"Under Pennsylvania law, a child can recover in a wrongful death action for the loss of companionship, comfort, society and guidance of a parent. *Steiner by Steiner v. Bell Telephone Co.,* 358 Pa. Super. 505, 510, 517 A.2d 1348, 1356 (1986), *aff'd,* 518 Pa. 57, 540 A.2d 266 (1988). This element of damages has also been described as 'loss of guidance, tutelage, and moral upbringing.' *Buchecker v. Reading Co.,* 271 Pa. Super. 35, 57, 412 A.2d 147, 158 (1979)." *Id.* at 1244-45 (footnote omitted) (quoting *Walton v. Avco Corp.,* 383 Pa. Super. 518, 549, 557 A.2d 372, 388 (1989), *aff'd in part, rev'd in part, and remanded,* 530 Pa. 568, 610 A.2d 454 (1992)).

The *Steiner* case relied upon by *Machado* in turn relies upon the Pennsylvania Supreme Court decision in *Spangler v. Helm's New York-Pittsburgh Motor Express,* 396 Pa. 482, 153 A.2d 490 (1959). In *Spangler,* Justice Musmanno recognized the unfortunate need of awarding damages in wrongful death cases in the following terms, describing the damages recoverable for the death of a woman survived by her husband and three minor children:

"The only question on this appeal must be stated in terms which might seem materialistic, namely: What did Mrs. Spangler mean to these people in terms of money? Naturally, no husband and no children see in the person dearest to them a money equivalent, and, during life, such an evaluation would be unqualifiedly brutal and offensive. However, with death, problems arise which must be solved, harsh and heartrending as they may be. Thus, as Mr. Spangler and his children now face a future with the main pillar of their family structure missing, the ques-

tion inescapably follows: How much do they need to supplant that pillar?" *Id.* at 484, 153 A.2d at 492.

Then after enumerating specific domestic chores Mrs. Spangler had performed, Justice Musmanno stated the following:

"There are services performed by a wife-mother, which no housekeeper can supply.

"The fact that there is no mathematical formula whereby compassionately bestowed benefits can be converted into a precise number of bank notes does not mean that the tort-feasor will be excused from making suitable reimbursement for their loss. The law commands that the wrongdoer pay what justice requires and common sense dictates. . . .

"Mrs. Spangler was unstintingly devoted to her family. . . . [H]er loyalty was expressed in an incessant activity, tireless energy, and never-flagging concern. She took the children to church regularly, she added to their religious instruction, she prayed with them, she accompanied them to baseball games and on fishing trips. All these things—such as companionship, comfort, society, guidance, solace, and protection which go into the vase of family happiness—are the things for which a wrongdoer must pay when he shatters the vase." *Id.* at 484-85, 153 A.2d at 492.

It is the reasoning of *Spangler* that will ultimately guide this court's decision.

The purpose of the Wrongful Death Statute is to compensate the decedent's spouse, parent or child for the pecuniary losses suffered as a result of the decedent's

death. *Kiser v. Schulte,* 538 Pa. 219, 226, 648 A.2d 1, 4 (1994); *Slaseman v. Myers,* 309 Pa. Super. 537, 549, 455 A.2d 1213, 1218 (1983). Pecuniary loss includes the value of services the decedent would have provided his family had he lived. *Slaseman,* 309 Pa. Super. at 549, 455 A.2d at 1218. Included among those services is the providing of society and comfort. For instance, a spouse is entitled to recover for the loss of the society and comfort the deceased spouse would have provided. *Rittenhouse v. Hanks,* 777 A.2d 1113, 1120 (Pa. Super. 2001), *app. denied,* 568 Pa. 677, 796 A.2d 318 (2002); *Slaseman,* 309 Pa. Super. at 549, 455 A.2d at 1218. Also, a child can recover for the loss of the guidance, tutelage and moral upbringing the deceased parent would have provided. *Machado,* 804 A.2d at 1245; *Quinn v. PennDOT,* 719 A.2d 1105 (Pa. Commw. 1998), *app. denied,* 558 Pa. 626, 737 A.2d 1227 (1999). See also, *Walton v. Avco Corp.,* 383 Pa. Super. 518, 549, 557 A.2d 372, 388 (1989), *aff'd in part, rev'd in part, and remanded,* 530 Pa. 568, 610 A.2d 454 (1992). The damages recoverable under the Wrongful Death Act are not limited solely to the loss of the decedent's monetary contributions which the survivors have been denied. The Wrongful Death Act permits recovery for the pecuniary value of the loss of services and included among those services is the providing of society and comfort. *Machado, supra; Rittenhouse, supra; Slaseman, supra; Walton, supra.*

The language in *Skoda, supra,* cited to by defendants as denying the right to claim damages for loss of companionship in a wrongful death action, does not alter this conclusion. In *Skoda,* the Pennsylvania Supreme Court,

when describing what damages were recoverable under the Wrongful Death Act, stated:

"[T]he administratrix was entitled to recover for the benefit of the daughter and herself as widow the amount of the pecuniary loss they . . . would have received from his earnings for their support during the period of his life expectancy and while the family relationship continued between them, but without any allowance for mental suffering, grief, or loss of companionship . . . ." 411 Pa. at 334, 191 A.2d at 829.

For this statement, the Supreme Court cited to *Ferne v. Chadderton,* 363 Pa. 191, 69 A.2d 104 (1949). In *Ferne,* the administratrix brought a claim under the Wrongful Death Act for the benefit of a widow and daughter. The *Ferne* court stated that, under the Wrongful Death Act, the proper measure of recovery was to be "without any allowance for mental suffering, grief, or loss of companionship; in other words, the measure of damages is the value of the decedent's life to [a party] specified in the statute." *Id.* at 197, 69 A.2d at 107. *Ferne* specifically disapproved of the jury's apportioning the amount of damages under the Wrongful Death Act between the surviving widow and surviving child. The Supreme Court has also referred to this statement from *Skoda* and *Ferne* in *Papieves v. Kelly,* 437 Pa. 373, 263 A.2d 118 (1970). Citing to *Ferne,* the Supreme Court stated in *Papieves* that "[N]o recovery has been allowed in wrongful death actions for grief and mental suffering resulting from the loss of a decedent." 437 Pa. at 380, 263 A.2d at 122.

It is clear that the Supreme Court's statement that no "loss of companionship" can be recovered in a wrongful

death action, as used in these cases, refers to a sense of emotional loss connected with the grief and mental suffering caused by the deceased no longer being physically present in the lives of the survivors. Actual companionship in the way of physical activity, which had been provided by the deceased to the survivors, is not found in the facts of these cases. The monetary value of such services is recoverable, or, in the words of *Spangler,* the loss of the bestowed benefits the deceased had given the survivors is to be appropriately compensated in a wrongful death action as a pecuniary loss.

The court interprets the foregoing line of cases as establishing a distinction between the emotional injuries of grief or mental suffering and actual injury from the loss of society and comfort. The grief and mental suffering is the emotional pain and sense of loss caused by the individual's death. This is a distinct injury sometimes referred to as "solatium" or injury to feelings that is traceable to an identifiable event and, under our law, not compensable. The loss of society and comfort is different. The loss of society and comfort is the loss of the everyday support that was provided by the decedent. This is a fine distinction the law makes, since both arise from the loss of companionship of a beloved family member. Accordingly, our courts in describing each type of loss have referenced each as including "loss of companionship." While solatium loss of companionship is not recoverable, it is evident that Pennsylvania courts have specifically held that damages arising from the loss of companionship connected to the benefits associated with society and comfort are recoverable. See *Machado, supra; Rittenhouse, supra; Slaseman, supra; Walton, supra.*

In the case before us, common sense dictates that the damages suffered by the parents for the loss of their child's society and comfort may be recovered under the Wrongful Death Statute for the same reasons recognized in *Spangler.* Like *Spangler,* the services a child may have provided a parent go beyond that a housekeeper could supply and may involve taking the parents to church, the store, on vacation or various activities, which, were it not for the child's attention and care, the parent would never enjoy. It is now a common experience that many adult children render valuable services to aging parents and the wrongful death of such a child certainly occasions a loss to their parent. The Wrongful Death Act itself does not exclude a parent from recovering for the damages arising from the death of a child, nor does the Wrongful Death Act limit such a recovery by a parent to those damages arising from the death of a minor child. To the contrary, it permits the named individuals—spouse, children or parents—to recover damages arising out of the person's death without distinction.

This court cannot ignore the clear mandate of the Wrongful Death Act. Just as *Machado, supra,* recognizes that a child who has been deprived of parental companionship, comfort, society and guidance by the wrongful death of a parent can be compensated, so to this court must recognize that parents can recover the same type of damages under the Wrongful Death Act upon the loss of a child. If the record can substantiate that Brenda, the decedent, did provide the benefits of companionship, comfort, guidance, solace and protection, to her surviving parents, then the jury will have the responsibility of determining an appropriate monetary award under the

Wrongful Death Act irrespective of the fact that such cannot be measured to the last dollar and penny. See *Spangler, supra.*

None of the appellate court decisions cited by counsel constrain this court's ruling allowing plaintiff parents to recover the noneconomic loss of the guidance, support, comfort, companionship and society that their child, Brenda Blair, would have provided to them. Although not cited to us by counsel, our independent research has disclosed the cases of *Department of Public Welfare v. Schultz,* 822 A.2d 876 (Pa. Commw. 2003), and *Vrabel v. PennDOT,* 844 A.2d 595 (Pa. Commw. 2004). Both *Schultz* and *Vrabel* held that, in a suit against the Commonwealth, a parent may not recover for the noneconomic losses associated with the death of their child. However, the holding of *Schultz* and *Vrabel* do not prevent the plaintiff parents in our case from pursuing the loss of Brenda's comfort and society under the Wrongful Death Act.

The specific holding in *Schultz,* relied upon in *Vrabel,* stated the following:

"We find no support in our law for the proposition that a parent may recover for the noneconomic loss of the guidance, support, comfort, maintenance, companionship and society of a child under the Wrongful Death Act *in the context of sovereign immunity* and we conclude as a matter of law that such damages are not recoverable." 822 A.2d at 878. (emphasis added)

From this language, and from the facts of the case, it is clear that the Commonwealth Court was limiting its holding to when sovereign immunity applies. This is

evident when in *Vrabel* the Commonwealth Court was addressing the argument of plaintiff parents that the holding of *Kiser v. Schulte*, 538 Pa. 219, 648 A.2d 1 (1994), which permitted the present value of services the deceased would have provided to the family to be recovered as wrongful death damages, would permit the recovery under the Wrongful Death Act for the loss of his son's services and stated that: "*Kiser* did not involve application of the Sovereign Immunity Act; consequently, the case is inapposite to this controversy where the Sovereign Immunity Act applies." 844 A.2d at 600. The Commonwealth Court has not ruled that noneconomic loss damages in the form of loss of a child's comfort and society could not be recovered under the Wrongful Death Act outside the context of sovereign immunity. That question has been left open for another day.[2]

Nor does this court's ruling stand in opposition or change the Commonwealth's established law regarding a loss of consortium claim. It has been held that a cause of action based on the loss of consortium is limited to spouses and does not extend to loss of a child's consortium. *Quinn v. Pittsburgh*, 243 Pa. 521, 90 A. 353 (1914); *Jackson v. Tastykake Inc.*, 437 Pa. Super. 34, 40, 648 A.2d 1214, 1217 (1994); *Schroeder v. Ear, Nose and Throat Associates of Lehigh Valley Inc.*, 383 Pa. Super.

2. That day may soon be at hand. The Pennsylvania Superior Court granted Schultz' petition for allowance of appeal. *Department of Public Welfare v. Schultz*, 575 Pa. 165, 835 A.2d 707 (2003). The Supreme Court heard oral arguments in the case on April 13, 2004. 27 PLW 444. A decision by the Supreme Court in the *Schultz* case will likely focus on the recovery of the loss of a child's comfort and society in the context of sovereign immunity, but it could also give some guidance as to the recoverability of such noneconomic losses under the WDA.

440, 557 A.2d 21 (1989) (loss of parental and loss of filial consortium are not recoverable). This is because, by definition, there cannot be filial consortium as consortium is "the legal right of one *spouse* to the company, affection, and assistance of and to *sexual relations* with the other." *Machado,* 804 A.2d at 1244 (emphasis in original) (quoting Webster's Collegiate Dictionary, 10th Edition (1998)). Permitting the parents to recover for the loss of society and comfort that would have been provided by their deceased child is not done so under a general theory of child consortium, but is allowed as part of the damage recoverable under the Wrongful Death Act. See *id.* at 1245. While there may be similarities between the types of services recoverable under the Wrongful Death Act and the definition of consortium, they are not one and the same.

Accordingly, the demurrer to the request for damages resulting from the loss of the companionship, society, comfort, guidance, solace and protection Brenda would have provided will be denied.

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Turning to the third preliminary objection raised by the defendants, the demurrer to the plaintiffs' negligent infliction of emotional distress claim will be granted in part and denied in part. "The basis of recovery for a claim of negligent infliction of emotional distress is the traumatic impact of viewing the negligent injury of a close relative." *Love v. Cramer,* 414 Pa. Super. 231, 234, 606 A.2d 1175, 1177 (1992). To establish a claim for negli-

gent infliction of emotional distress, the plaintiff must show that: (1) he was located near the scene of the accident as contrasted with one who was a distance away from it; (2) the shock resulted from a direct emotional impact upon the plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence; and (3) the plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship. *Sinn v. Burd,* 486 Pa. 146, 170-71, 404 A.2d 672, 685 (1979); *Love,* 414 Pa. Super. at 234, 606 A.2d at 1177. The plaintiff must experience a sensory and contemporaneous observation of a discrete and identifiable traumatic event to trigger recovery. *Love,* 414 Pa. Super. at 234, 606 A.2d at 1177. While the plaintiff does not have to know at the time that the alleged conduct, which injured his relative, was negligent, he must be aware at the time that something was wrong or lacking. *McElwee v. Leber,* 57 D.&C.4th 378, 396 (Lycoming Cty. 2002). The plaintiff must also suffer physical injury in the form of physical manifestations of the emotional distress as a result of witnessing the harm to the close relative. See *Love,* 414 Pa. Super. at 234, 606 A.2d at 1177.

A fair reading of the amended complaint illustrates two events that the plaintiffs allege trigger recovery—the deterioration of Brenda's medical condition and her death. It is unclear from the amended complaint who, if any, of the plaintiffs, observed the death of Brenda and how they made that observation. There are no factual allegations that establish this. As such, the demurrer will be granted as to this theory.

As to the deteriorating condition theory, the demurrer is granted only to Joseph Blair's claim. The amended complaint has pleaded that Joyce Blair and Catherine Winnie were present and observed the medical care rendered by Dr. Mehta to Brenda on June 19 and June 20, 2001. The amended complaint has also pleaded that at the time this care was given they were suspicious and concerned about said care. Further, the amended complaint alleges that they observed the deterioration of Brenda's condition from June 21, 2001, through June 27, 2001. Joyce Blair and Catherine Winnie have pleaded a cause of action for negligent infliction of emotional distress against Dr. Mehta.

Joseph Blair has failed to plead a negligent infliction of emotional distress cause of action. The amended complaint does not allege that he was aware that there was something wrong with the treatment rendered his daughter. The amended complaint does allege that he expressed concern to Drs. Simms, Datta, and Mehta, but it does not say when that concern was expressed so as to indicate that he was aware that there was something wrong with the medical care while Dr. Mehta was administering it. As such, Joseph Blair has failed to state a cause of action for negligent infliction of emotional distress against Dr. Mehta.

Accordingly, the demurrer to the plaintiffs' negligent infliction of emotional distress claim in Count V of the amended complaint will be granted in part and denied in part.

## PUNITIVE DAMAGES

Finally, the court will address the motion to strike the punitive damages claim against Dr. Mehta. "Punitive

damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others." 40 P.S. §1303.505(a). The purposes of punitive damages are to punish a defendant for his outrageous conduct and to deter others from engaging in similar conduct. *Judge Technical Services Inc. v. Clancy,* 813 A.2d 879, 888 (Pa. Super. 2002). Punitive damages will not be awarded for ordinary negligence or even gross negligence. *Slappo v. J's Development Associates Inc.,* 791 A.2d 409, 417 (Pa. Super. 2002).

Punitive damages are permitted only in cases of outrageous behavior. For purposes of punitive damages, outrageous behavior is conduct that shows an evil motive or reckless indifference to the rights of others. *Slappo,* 791 A.2d at 417. An individual acts recklessly when the "actor knows, or has reason to know, . . . of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk . . . ." *Martin v. Johns-Manville Corp.,* 508 Pa. 154, 171, 494 A.2d 1088, 1097 (1985) (quoting Restatement (Second) of Torts §500, comment a (1965)).

As a whole, the complaint asserts Dr. Mehta was aware of the risk that Brenda Blair's deteriorating condition and symptoms posed, being aware at least that she was exposed to the risk of the eventual harm she suffered. Yet, despite this awareness, it is alleged Dr. Mehta failed to obtain a surgical consult, but instead discharged Brenda to her home with inadequate care, medication, and precautions necessary to meet the risks posed by her medical condition. The court cannot hold that as a matter of

law the allegations made by plaintiffs against Dr. Mehta are insufficient to warrant an award of punitive damages as the pleadings thus far, if true, would permit a jury to infer that the alleged conduct was done with reckless indifference to the rights of Brenda Blair. Whether Dr. Mehta's alleged conduct was in such blatant disregard of a known risk, as alleged, presents an issue for the trier of fact. Such a holding would now be premature. Therefore, the preliminary objection is denied.

Accordingly, the preliminary objections filed November 7, 2003, are denied in part and granted in part.

## ORDER

It is hereby ordered that the preliminary objections of defendants Pankaj Mehta M.D. and Women's Health Care Associates P.C. filed November 7, 2003, are denied in part and granted in part.

The motion to strike subparagraph 69.8 is granted and it is stricken from the amended complaint. The motion to strike is denied in all other respects.

The demurrer to the request for damages resulting from the loss of the companionship, society, comfort, guidance, solace and protection Brenda Blair would have provided is denied.

The demurrer to the plaintiffs' negligent infliction of emotional distress claim of Joyce Blair and Catherine Winnie based on their witnessing the death of Brenda Blair is granted and the claim is dismissed.

The demurrer to the negligent infliction of emotional distress claim of Joseph Blair is granted and the claim is dismissed.

The demurrer to the negligent infliction of emotional distress claim of Joyce Blair and Catherine Winnie based on their witnessing the deterioration of Brenda Blair's medical condition is denied.

The motion to strike the punitive damages claim against Dr. Mehta is denied.

Plaintiffs shall have 20 days after notice of this order to file an amended complaint.

The court issued an opinion and order on September 10, 2004 addressing preliminary objections filed by Dr. Mehta and Women's Healthcare Associates P.C. to the second amended complaint. A majority of the preliminary objections were the same as those that were raised against the first amended complaint and addressed in the June 10, 2004 opinion and order. As such, the September 10, 2004 opinion and order is in line with the June 10, 2004 opinion and order.

The court also issued an order modifying the wording of the June 10, 2004 opinion and order to read as set forth *supra*.